IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

VANESSA BUSS,

              Plaintiff,

      v.

PEACEHEALTH, a corporation,

              Defendant.

**OPINION & ORDER**

Civ. No. 6:23-cv-01128-AA

AIKEN, District Judge.

Plaintiff Vanessa Buss brings a disability accommodation claim under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, and ORS 659A.112 against her former employer Defendant PeaceHealth. *See* Compl., ECF No. 1. Before the Court is Defendant's Motion for Summary Judgment, ECF No. 27. For the reasons explained below, the Motion, ECF No. 27, is GRANTED.

## BACKGROUND

"PeaceHealth is a not-for-profit healthcare system headquartered in Vancouver, Washington, with medical centers, critical access hospitals, and medical clinics located in Washington, Oregon, and Alaska." Le Decl. ¶ 3, ECF No. 30. "As of August 2021, PeaceHealth employed approximately 16,250 caregivers across Alaska, Oregon, and Washington," including "approximately 5,720 caregivers in Oregon." *Id.*

Page 1 – OPINION AND ORDER

I.    *The COVID-19 Pandemic*

From May 5, 2020, until May 11, 2023, COVID-19, an infection caused by the virus SARS-CoV-2, "one of the most contagious currently known human pathogens" caused a global pandemic.  Koekkoek Decl. ¶ 4, ECF No. 33.[1]  During the summer of 2021, the COVID-19 Delta variant, "the deadliest and most transmissible variant of [the SARS-CoV-2 virus] to date," *id.* ¶ 10, caused an approximate 300% spike in national COVID-19 cases, *id.* ¶ 37, Ex. 12, ECF No. 33-12, and an Oregon spike that exceeded Oregon Health Science University's ("OHSU's") worst case scenario prediction models, *id.* ¶ 19, Ex. 4, 5, 6, ECF Nos. 33-4, 33-5, 33-6.

Dr. Koekkoek affirmed that "[i]n [his] 35-plus years in healthcare, [he] ha[s] never experienced anything like the Delta variant."  *Id.* ¶ 11.  He attested that "PeaceHealth's facilities were overflowing with patients[,]" that their ICUs were so full that they "had to stop elective surgeries and convert [former ICU] recovery areas into COVID ICU areas[,]" *id.*, "which created treatment delays for patients with other serious conditions[,]" *id.* ¶ 12.  Because the local morgues could not handle more dead bodies, PeaceHealth had to turn some of their areas into "cooling bays" to hold the bodies of individuals who had died from COVID-19[,] *id.* ¶ 11, that "the Oregon Governor activated the Oregon National Guard to assist PeaceHealth with everything from janitorial work to administering COVID-19 tests[,]" *id.* ¶ 22, and

---

[1] Dr. Douglas Koekkoek, MD, was PeaceHealth's Chief Physician and Clinical Executive during the pandemic.  Koekkoek Decl. ¶¶ 1, 4, ECF No. 33.

that "[t]he impact was devastating and profound—despite all precautionary efforts in effect[,]" *id.* ¶ 11.

II.    *Oregon Health Authority Response*

On August 5, 2021, in response to the Delta surge, the Oregon Health Authority ("OHA") issued a rule requiring all Oregon healthcare providers and staff to either be fully vaccinated against COVID-19 by September 30, 2021, or to "undergo COVID-19 testing at least weekly." *Former* OAR 333-019-1010(3)-(5) (eff. Aug. 5, 2021, to Aug. 24, 2021) ("OHA Rule" or the "Rule").

But on August 25, 2021, less than three weeks later, OHA amended the Rule to remove the testing option and to require vaccination of all health care providers and staff by October 18, 2021, absent medical or religious exception. *Former* OAR 333-019-1010(3)-(4), (eff. Aug. 25, 2021, to June 30, 2023). At that time, PeaceHealth and other health care facilities were already complying with requirements to mask and physical distance and to screen, triage, and isolate individuals with symptoms or known infection. *See former* OAR 333-019-1011 (eff. Aug. 20, 2021, to Mar 28, 2023); *former* OAR 437-001-0744 (eff. Nov. 6, 2020, to Apr. 2, 2023).

III.    *PeaceHealth's COVID-19 Vaccination Policy*

That summer, PeaceHealth convened an Ethical Discernment Team (the "Team") to determine whether PeaceHealth should require its caregivers to be vaccinated against COVID-19. *Id.* ¶¶ 24, 25 (citing Ex. 7, the Team's five-step decision-making process, ECF No. 33-7). In late July 2021 and throughout the Pandemic, the Team reviewed OHSU's Oregon Delta variant forecasts, *id.* ¶ 19

Page 3 – OPINION AND ORDER

(citing Ex. 4, 5, 6), PeaceHealth's internal epidemiological data, *id.* ¶ 21, CDC Morbidity & Mortality Weekly Reports ("MMWR") and other peer-reviewed scientific and medical data, *id.* ¶¶ 26, 31–41 (citing Ex. 9–17, ECF Nos. 33-9 through 33-17), recommendations from OHA, CDC, and professional health care organizations such as the American Nursing Association, American Hospital Association, and American Medical Association, *id.* ¶¶ 18, 28, 35–41 (citing Ex. 3, 11, 12, 13, 17, ECF Nos. 33-3, 33-11, 33-12, 33-13, 33-17), and actions taken by other major hospital systems such as the Veterans Administration, *id.* ¶ 28.   Dr. Koekkoek affirmed that "[b]y late July 2021, it was clear that the threat and ultimate arrival of the Delta variant posed a foundational risk to PeaceHealth's ability to deliver healthcare services." *Id.* ¶ 23.

Dr. Koekkoek also attested that "[b]y August 2021, COVID-19 had become a pandemic of the unvaccinated." *Id.* ¶ 20.  "PeaceHealth census data showed that approximately 80% of COVID-19 patients hospitalized in its Oregon facilities were unvaccinated, 90% of COVID-19 patients in Oregon ICUs were unvaccinated, and over 90% of COVID-19 patients in the ICU on a ventilator in Oregon were unvaccinated." *Id.*  "A significant portion of PeaceHealth's patients [were] medically vulnerable individuals, who either could not be vaccinated (due to age or medical conditions) or who, despite vaccination, [were] more susceptible to serious illness or death" from exposure and breakthrough contraction. *Id.* ¶¶ 7, 26–27, 32, 36.

Dr. Koekkoek attested that, by early August, then current medical and scientific data from CDC, OHA, and other leading public health sources showed that COVID-19 vaccines were safe and effective, protected against severe illness and

death, and reduced viral transmission. *Id.* ¶¶ 31, 32–37 (citing Ex. 9–17).[2] PeaceHealth's internal epidemiologic data also showed that COVID-19 vaccination reduced viral transmission. That data showed that a patient was 11.6 times more likely to get COVID-19 from an unvaccinated caregiver than from a vaccinated caregiver. *Id.* ¶ 21; *see also* Kroll Decl. ¶¶ 17–19, ECF No. 31 (citing Ex. 2, 3, 4, ECF No. 31-2, 31-3, 31-4). Dr. Koekkoek attested that "PeaceHealth's Infection Prevention team had traced the death of two patients at one of its facilities outside Oregon to COVID-19 exposure from an unvaccinated caregiver." *Id.* ¶ 44. As of August 3, 2021,

---

[2] A review of vaccine efficacy studies "showed that through the end of June 2021, COVID-19 vaccines had averted an estimated 279,000 deaths and 1.25 million hospitalizations in the United States." Koekkoek Decl. ¶ 33, Ex. 9, ECF No. 33-9 (Stephen J.W. Evans & Nicholas P. Jewell, *Vaccine Effectiveness Studies in the Field*, 385(7) N. ENG. J. MED. 650 (Aug. 2, 2021)); A New England Journal of Medicine ("NEJM") study "showed that being fully vaccinated against COVID-19 reduced the risk of infection by 91% and still protected against severe illness and hospitalization if breakthrough infection occurred." Koekkoek ¶ 34, Ex. 10, ECF No. 33-10 (Mark G. Thompson, et al., *Prevention and Attenuation of Covid-19 with the BNT162b2 and mRNA-1273 Vaccines*, 385(4) N. ENG. J. MED. 320–329 (June 30, 2021)); A July 29, 2021 CDC Report "indicated that unvaccinated individuals were 8 times more likely to contract COVID-19 than vaccinated individuals; 25 times more likely to be hospitalized if they contracted COVID-19; and 25 times more likely to die as a result of COVID-19." Koekkoek ¶ 36, Ex. 11, ECF No. 33-11 (CDC, *Improving communications around vaccine breakthrough and vaccine effectiveness*, (July 29, 2021)); A September 2021 CDC study that "pooled clinical and observational trial data for the Pfizer BioNTech vaccine showed that [the vaccine] was approximately 95% effective at preventing hospitalization or death." Koekkoek Decl. ¶ 40, Ex. 15, ECF No. 33-15 (Kathleen Dooling, et al., *Use of Pfizer-BioNTech COVID-19 Vaccine in Persons Aged >16 Years: Recommendations of the Advisory Committee on Immunization Practice–United States, September 2021*, 70 MMWR 2021:1344–1348 (Sept. 24, 2001), https://www.cdc.gov/mmwr/volumes/70/wr/mm7038e2.htm (last visited Mar. 13, 2026).

19.7% of Oregon PeaceHealth employees were unvaccinated or undeclared (failed to respond to vaccination status surveys).  Le Decl. ¶ 13.

On July 27, 2021, the Team unanimously decided to implement a vaccination requirement that complied with the OHA Rule.  *Id.* ¶¶ 26, 27.  The policy was announced on August 3, 2021, i*d.* ¶ 29, but was updated on August 30, after OHA removed the testing option from its Rule, Le Decl. ¶ 17.

On August 16, 2021, the Team decided to implement a medical and religious exception policy and "considered potential options . . . for those caregivers who could not work fully remotely."  Koekkoek Decl. ¶¶ 42, 43, Ex. 18, ECF No. 33-18.  The Team determined, based on its "review of the internal and external data and guidance [and] . . . the medical science[,] . . . that, while multiple methods of protection against COVID-19 were important, vaccination was the single most important method."  *Id.* ¶ 43.  The Team determined that, "unlike vaccination, other methods—such as PPE (including N95 masks), testing, social distancing, restrictions on visitation, and additional hand hygiene protocols—were already the 'baseline' requirements, do not provide continuous protection 24 hours per day, and are susceptible to human error[,]"and that, to be effective, PPE must be worn properly and must be worn continuously but was less likely to be worn, for example, in breakrooms where transmission could occur.  *Id.* ¶ 44.  As to testing, Dr. Koekkoek affirmed that by time a test is positive, an infected person is likely to be contagious for 48 hours before the test and that the cost of repeatedly testing a large volume of unvaccinated caregivers was "significant."  *Id.* ¶ 45.  The Team determined that, unlike the other preventive

measures, "vaccination not only protects against acquiring and transmitting the virus, it also—unlike any other preventative measures—reduces the likelihood that an infected individual is contagious or will develop serious illness or death if they do contract the virus." *Id.* ¶ 46.

Dr. Koekkoek affirmed that, given the risk of transmission to PeaceHealth's vulnerable patient population and to staff, the Team determined that allowing unvaccinated caregivers to work onsite was an "unjustifiable" risk regardless of whether the caregiver was in a direct patient care role or not. *Id.* ¶¶ 43, 44. That "caregivers themselves were also at risk . . . threatened PeaceHealth's ability to continue providing essential, life-saving treatment for its patients." *Id.* ¶ 49. For that reason, the Team determined that "allowing unvaccinated caregivers to work in person (even with other precautions) would have subjected other caregivers and patients . . . to a higher risk of contracting COVID-19." *Id.* ¶¶ 48, 49.

IV.    *Plaintiff's Claim*

In August 2021, Plaintiff was employed as a Quality Program Lead at Peace Harbor Medical Center. Buss Decl. ¶¶ 2, 6, ECF No. 36. Plaintiff applied for and was granted both a religious and a medical exception to PeaceHealth's vaccination requirement. Le Decl. ¶¶ 33, 34. Plaintiff was placed on unpaid administrative leave and was later terminated. *Id.* ¶¶ 35, 36, 39. In November 2024, Plaintiff applied for the Management Assistant Lead position at PeaceHealth and was hired. *Id.* ¶ 39. Plaintiff brings disability accommodation claims against PeaceHealth. *See* Compl.

¶¶ 36–42. Her religious accommodation claims were dismissed under Federal Rule of Civil Procedure 12(b)(6). *See* Opinion & Order, ECF No. 15.

## LEGAL STANDARD

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see also Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" (quoting *Celotex*, 477 U.S. at 325)). In reviewing a summary judgment motion, a court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001).

## DISCUSSION

Plaintiff brings a disability discrimination claim against PeaceHealth for its failure to accommodate her disability under the ADA and Oregon law.

Defendant contends that Plaintiff cannot establish a *prima facie* disability claim, Def. Mot. at 19, and that, even if she could, any accommodation other than administrative leave would have posed an undue hardship or direct threat, *id.* at 23.

I.    *Prima Facie Disability Discrimination Claim*

Defendant contends that "[Plaintiff] is not 'disabled' for purposes of the ADA or ORS 659A.112." Def. Mot. at 19.

Under the ADA, it is unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112. Oregon disability claims are analyzed together with ADA claims. *See Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1087 (9th Cir. 2001) ("The standard for establishing a *prima facie* case of discrimination under Oregon law is identical to that used in federal law."). "The ADA treats the failure to provide a reasonable accommodation as an act of discrimination if the employee is a 'qualified individual,' the employer receives adequate notice, and a reasonable accommodation is available that would not place an undue hardship on the operation of the employer's business." *Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th Cir. 2018) (citing 42 U.S.C. § 12112(b)(5)(A)).

The ADA and Oregon analogue provide a two-step analysis for failure-to-accommodate disability claims. First, a plaintiff must show that (1) the plaintiff is disabled under the ADA; (2) the plaintiff is a qualified individual with a disability, that is, the plaintiff could perform the essential functions of the position with or without reasonable accommodation; and (3) the employer did not provide reasonable accommodation. *Dunlap v. Liberty Nat. Prod., Inc.*, 878 F.3d 794, 798–99 (9th Cir. 2017).

Once the plaintiff has made a *prima facie* case, the burden shifts to the defendant who may invoke one of two possible affirmative defenses: (1) undue hardship—the accommodation "would impose an undue hardship on the operation of the business;" or (2) direct threat—the plaintiff would "pose a direct threat to the health or safety of other individuals in the workplace." 42 U.S.C. §§ 12112(b)(5)(A), 12113(b); *see also 29 C.F.R. §* 1630.15(b)(2), (d).

To be disabled under the ADA, a plaintiff must show (A) she had "a physical or mental impairment that substantially limit[ed] one or more major life activities[;]" or (B) "a record of such an impairment;" or (C) "[was] regarded as having such an impairment." 42 U.S.C. § 12102(1); 29 C.F.R. § 1630.2(g); ORS 659A.104.

In general, "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). Major life

Page 10 – OPINION AND ORDER

activities also include "the operation of a major bodily function, including but not limited to, functions of the immune system[.]" *Id.* § 12102(2)(B).

Plaintiff contends that her disability was a "hypersensitive immune system" that placed her at "high risk" of having an allergic reaction to the COVID vaccine. Pl. Resp. at 5, ECF No. 35. Plaintiff contends that her hypersensitive immune system is evidenced by "rare complications and abnormalities" including pain and physical impairment from two hip surgeries on the same leg, one in 2018 (a total hip replacement in which hardware was place) and one in 2020 (to replace the original hardware). Buss Decl. ¶¶ 3, 4. Plaintiff maintains, however, that for the purpose of her disability claim, her "disability is *not* [her] hip pain. The disability is her documented hypersensitive immune system[.]" Pl. Resp. at 5 (emphasis added).

Even assuming that Plaintiff has a hypersensitive immune system that increased her risk of having an adverse reaction to the COVID-19 vaccine—and the record does not support this contention[3] —Plaintiff provides no evidence that her hypersensitive immune system limited one or more of her major life activities.

---

[3] Plaintiff contends that on August 25, 2021, "Dr. Jeffrey Hughes" provided a letter "explaining why [Plaintiff] was contraindicated for the COVID vaccine." Pl. Resp. at 3, 4. The letter, signed by Mr. Jeffery Hughes, a physician assistant, states: "I consider it reasonable for the patient to abstain from COVID vaccination. Possible negative outcomes may not simply include allergic reaction, site reaction, or rash, but may increase patient's underlying pain, and complicate her prolonged surgical recovery which is already compromised." Buss Decl. at 10, Aug. 25, 2021 Hughes letter, ECF No. 36. But Plaintiff's medical records show that on August 5, 2025, Plaintiff was seen by Mr. Hughes, who reported: "Based upon medical review, [Plaintiff] does not have any contraindications for receiving the vaccine[.] . . . We discussed her previous surgical outcomes and that these are likely not related to her immune system, however due to [in]appropriateness of the procedure/device used." Riggs Second Decl. ¶ 4, Plaintiff's Medical Records, Ex. 3 at 8, 11, ECF No. 34-3.

Plaintiff contends that "a major life activity . . . includes the operation of functions of the immune system." Pl. Resp. at 6 (citing 42 U.S.C. § 12102(2)(B)). Even so, Plaintiff fails to provide evidence that her immune system caused any physical or mental impairment that is relevant to her claim. Plaintiff contends only that her immune system prevented her from receiving a COVID-19 vaccine. But she cites no authority to support that receiving a vaccination is a major life activity under the ADA. *See Mathisen v. Oregon Health and Sciences Univ.*, No. 3:22-cv-1250-SI, 2023 WL 6147099, at *6 n.8 (D. Or. Sept. 20, 2023) (rejecting argument that "receiving a vaccination is a qualifying 'major life activity'"); *White v. Columbia Sportswear Co.*, No. 3:24-cv-00006-SB, 2024 WL 5080032, at *14 (D. Or. Oct. 28, 2024) (same).

Plaintiff also contends that the granting of her medical exception request proves that she had a disability under the ADA. Pl. Resp. at 5. When Plaintiff requested a vaccination exception from PeaceHealth, she did not convey that she had either of the two qualifying vaccination contraindications—a history of severe anaphylactic shock to a first vaccine dose or allergy to a vaccine component or Guillain-Barre Syndrome within six weeks of receiving a prior vaccine. Le Decl. ¶ 34. PeaceHealth attests that it granted the exception because it "generally erred on the side of approving medical exception requests." *Id.* Regardless of how PeaceHealth handled its medical exception requests, Plaintiff still has the burden to show, for the purpose of her disability claim, that she was disabled under the ADA.

Page 12 – OPINION AND ORDER

Finally, Plaintiff contends that "[Mr.] Hughes['] letter establishes that [Plaintiff] has a record of . . . impairment and is regarded as having such impairment." Pl. Resp. at 6 (citing 42 U.S.C. § 12102(1)). On August 25, 2021, Physician Assistant Hughes provided Plaintiff a letter stating that "it [was] reasonable for the patient to abstain from COVID vaccination" even though Plaintiff had no qualifying vaccination contraindications. Buss Decl. at 10, Aug. 25, 2021 Hughes letter, ECF No. 36; *see also* Riggs Second Decl. ¶ 4, Ex. 3 at 8, 11, Plaintiff's Medical Records, ECF No. 34-3 (Hughes documentation that Plaintiff did not have any contraindications to COVID-19 vaccination and that Plaintiff's prior surgical outcomes "[were] likely not related to her immune system"). Plaintiff does not dispute that she had no qualifying contraindications to the COVID-19 vaccine. *See* Lauren Decl., Ex. 3, Buss Dep. 74:01–19; 75:03–05; 80:09–11; 91:15–22, ECF No. 39-3 (affirming that she had not ever experienced a prior adverse vaccination reaction and that she had no qualifying contraindications to the COVID-19 vaccine).

On this record, no reasonable jury could find that Plaintiff had a vaccine contraindication that limited a major life activity or that she had a record of such impairment or was "regarded as having" such impairment. Merely requiring Plaintiff to follow a COVID-19 policy applicable to all employees does not support the inference that PeaceHealth classified Plaintiff as disabled under the ADA. For these reasons, Plaintiff fails to meet her burden to show that she was disabled under the ADA.

II.    *Undue Hardship and Direct Threat*

Even assuming that Plaintiff had met her burden to establish a disability accommodation claim under the ADA, PeaceHealth contends that it is entitled to summary judgment on the undue hardship and direct threat defenses to that claim. Def. Mot. at 23.

A.    *Evidentiary Objection*

Plaintiff offers the expert report of Dr. Colleen Huber, a naturopathic doctor, to support her assertion that PeaceHealth could have accommodated Plaintiff by offering ivermectin as COVID-19 prophylaxis. Pl. Resp. at 12, 13; *see* Lauren Decl., Ex. 2, Huber Report, ECF No. 39-2; Huber Decl., ECF No. 37. PeaceHealth moves to exclude Dr. Huber's testimony because she is unqualified "to render the opinions in her declaration" and because her opinions are not "relevant and reliable under *Daubert* and Rule 702." Def. Reply at 6, ECF No. 38.

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Rule 702 permits a qualified expert to present testimony that "will help the trier of fact to understand the evidence or to determine a fact in issue," so long as (1) "the testimony is based on sufficient facts or data;" (2) "the testimony is the product of reliable principles and methods;" and (3) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593–95 (1993). The proponent of expert evidence must prove its admissibility by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 n.10.

Page 14 – OPINION AND ORDER

1.    *Dr. Huber is not Qualified to Offer Expert Scientific Opinion*

A party who seeks to introduce expert testimony must show that their expert is qualified "by knowledge, skill, experience, training, or education" to render an opinion.  Fed. R. Evid. 702.

Dr. Huber is not qualified to offer expert scientific opinion on the hospital management of COVID-19 because she lacks the knowledge, experience, training, and education to offer expert scientific opinion on the hospital management of COVID-19 during a pandemic.  Dr. Huber is trained and has practiced as a naturopathic physician.  Lauren Decl., Ex. 1, Huber Dep. 79:02–11, ECF No. 39-1; *see also* Huber Report at 8 (Dr. Huber's Curriculum Vitae ("CV")).  Though she may be qualified to offer expert testimony on matters within her naturopathic training and practice, she lacks allopathic medical education and training in immunology, epidemiology, and infectious diseases.  *See*, *e.g.*, *Advocare Int'l L.P. v. Horizon Lab'ys, Inc.*, No. CIV. 3:04-CV-1988-H, 2006 WL 176573, at *2 (N.D. Tex. Jan. 24, 2006) (finding witness with doctorate in naturopathy, Ph.D. candidacy in molecular biology, and employment experience as technical director of natural supplement company qualified to offer expert testimony on "costs and standards in the nutritional supplement industry, including its raw materials market"); *Pooshs v. Phillip Morris USA, Inc.*, 287 F.R.D. 543, 548 (N.D. Cal. 2012) (excluding naturopath under *Daubert* and Rule 702 because she was "not qualified in any scientific discipline that would enable her to render reliable opinions" as to "addiction, the addictive qualities of cigarettes, the 'adulteration' of cigarettes, the action of nicotine on the human body,

Page 15 – OPINION AND ORDER

[and] the effect on the human body of secondhand smoke"). Dr. Huber also does not have relevant training in biostatistics, epidemiology, or a related field that would qualify her to conduct or interpret meta-analyses, literature reviews, or clinical studies.

Further, Dr. Huber's license to practice naturopathic medicine was revoked for "unprofessional conduct" in October 2022 by the Arizona Naturopathic Physicians Medical Board (the "Board"). Lauren Decl., Ex. 4, In the Matter of Colleen Huber, N.M.D., Case No. 22-216-NMB, *at 10–11, ECF No. 39-4. The Board found that Dr. Huber was treating cancer patients with intravenous solutions ("IVs") that contained "bicarb and other nutrients" and had failed to properly chart patient visits including patient symptoms, clinical findings, and treatment, including the IV ingredients and "the dosage or strength amounts." *Id.* ¶¶ 9–14, 22–34, 36–41. The Board also found that Dr. Huber refused to properly chart patient visits even after the Board required her to attend a medical education course in recordkeeping, *id.* ¶ 19, 28, 42, 43, 45; that she failed to obtain patient consent to receive the IVs, *id.* ¶ 46; and that she refused to disclose IV ingredients to patients and to the Board, *id.* ¶¶ 42, 43, 44.

For these reasons, Dr. Huber is not qualified to provide expert scientific opinion on the hospital management of COVID-19.

   2.    *Huber's Opinion is Not Reliable*

Even if Dr. Huber were qualified to provide expert scientific opinion on the hospital management of COVID-19 during a pandemic, her opinion that ivermectin is an effective alternative to COVID-19 vaccination is not reliable.

Page 16 – OPINION AND ORDER

Trial judges are charged with ensuring that "any and all . . . [expert] evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. "Under *Daubert*, the trial court must act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards by making a preliminary determination that the expert's testimony is reliable." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). "A district court cannot be silent about reliability when challenged." *United States v. Holguin*, 51 F.4th 841, 854 (9th Cir. 2022).

To be reliable, expert testimony must be "based on sufficient facts or data[,]" *i.e.*, on external objective sources, not on "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590 (quoting Fed. R. Evid. 702). And an expert must show the court that they have used reliable methodology based on facts and data to reach their conclusions. *In re Phenylpropanolamine (PPA) Products Liability Litigation*, 289 F. Supp. 2d 1230, 1238 (W.D. Wash. 2003) ("In the absence of independent research or peer review, experts must explain the process by which they reached their conclusions and identify some type of objective source demonstrating their adherence to [sound methodology]."). "[T]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of [the] methodology." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010), *as amended* (Apr. 27, 2010) (quoting *Daubert*, 509 U.S. at 595). That is, the "court must assess the expert's reasoning or methodology, using as appropriate criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general

Page 17 – OPINION AND ORDER

acceptance." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014). But "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

In her expert report, Dr. Huber states that, in her opinion, "PeaceHealth could have offered ivermectin as an accommodation to any employee in a healthcare setting from taking the COVID-19 vaccine, so that they could continue to work[,]" including Plaintiff. Hubert Report ¶ 18. As the basis for her opinion, Dr. Huber cites her treatment of "between 100 and 200 patients who showed signs and/or symptoms of COVID-19 illness during the peak COVID years." *Id.* ¶ 2. Dr. Huber also cites her 2021 self-published book titled "The Defeat of COVID: 500+ Medical Studies Show What Works and What Doesn't," which contains over "500 studies" including "twenty-one meta-analyses and peer-reviewed studies regarding the safety and effectiveness of ivermectin." *Id.* Dr. Huber further cites several specific ivermectin studies. *See id.* ¶¶ 10–15. And, finally, Dr. Huber cites the "hundreds of published articles" she has written about the safety and efficacy of ivermectin as COVID-19 treatment and preventative. *Id.* ¶ 2.

Dr. Huber's opinions are not reliable because they are not based on sufficient facts or data, nor are they the product of reliable scientific methodology.

       a.    *Clinical Experience*

Dr. Huber states that her expert opinion is based, in part, on her clinical experience of treating "100 to 200 patients" with ivermectin. But PeaceHealth's

Page 18 – OPINION AND ORDER

rebuttal expert, Dr. William Ehni, MD,[4] notes that Dr. Huber failed to disclose important details about her clinical experience including the exact number of patients she treated, patient demographics, pre-treatment patient information, a protocol including the ivermectin dose used, post-treatment patient information, and whether she use a control group. Lauren Decl., Ex. 5, Ehni Rebuttal ¶ 3, ECF No. 39-5; Huber Dep. 170:14–177:25 (describing her clinical experience); 186:06–17 (explaining that she did not test any of her patients for COVID-19 before or after treatment because "there is no reliable lab tests for COVID, nor was there in peak COVID years"). For these reasons, Dr. Ehni contends that Dr. Huber's clinical report is "anecdotal evidence that should not be relied on to prove or disprove the efficacy of ivermectin in the treatment or prophylaxis of COVID-19 infection." *Id.* In response, Dr. Huber does not supply the missing details or documentation of her clinical experience and, for that reason, fails to rebut the characterization of her clinical report as anecdotal evidence. Anecdotal evidence is not a reliable basis for an expert scientific opinion.

b.    *Ivermectin Studies*

Second, Dr. Huber states that her opinion is also based on the ivermectin studies that she cites in her report, the ivermectin studies in her self-published book, and the "hundreds of published studies" that she herself has written. But the studies

---

[4] Dr. William Ehni, MD, is Board Certified in Internal Medicine and Infectious Disease. Lauren Decl., Ex. 5, Ehni Rebuttal ¶ 1, ECF No. 39-5. Dr. Ehni has practiced medicine for 34 years. *Id.* During the COVD-19 pandemic, he worked for both the University of Washington and the Swedish Healthcare systems. *Id.* ¶¶ 1, 13. And, from 2015 through 2024, he was "assistant professor at the University of Washington in clinical infectious disease." *Id.*

Page 19 – OPINION AND ORDER

to which she refers are severely flawed, and the studies she authored were not published in a peer-reviewed scientific or medical journal.

In her report, Dr. Huber repeatedly cites a "meta-analysis" of ivermectin studies—presumably the same meta-analysis and studies she cites in her book—that she claims shows that ivermectin is an effective COVID-19 treatment and prophylaxis.[5] Huber Report ¶¶ 2, 10, 12, 13. Dr. Ehni notes that the "meta-analysis" is a website that lists more than 100 ivermectin studies. Rebuttal Report ¶ 6. He further notes that "[t]he authors are not listed at the start of the document as is typical for medical journal articles and textbooks[;]" "[m]any of the studies are not double blind, randomized controlled trials"—the "gold standard" for evaluating treatments; "the vast majority of the . . . studies had methodology problems" such as very small sample sizes, not statistically significant findings, and inadequate randomization; and, numerous studies used "one or multiple other treatments besides ivermectin[.]" *Id.* He notes that, in contrast, the ivermectin trials performed by NIH and Infectious Disease Society of America ("IDSA") were "better designed randomized control trials[,]" from which both NIH and IDSA concluded "that there was not convincing evidence that ivermectin was effective treatment for COVID-19." *Id.*

---

[5] C29.early.org., *lvermectin reduces COVID-19 risk: real-time meta-analysis of 106 studies*, C19IVM IVMMETA (updated Mar. 28, 2026), https://c19early.org/imeta.html.

Page 20 – OPINION AND ORDER

Dr. Huber's report also names three specific studies as the basis for her opinion that ivermectin is effective COVID-19 treatment and prophylaxis.[6] *See* Huber Report ¶¶ 10, 11, 13.  Dr. Ehni reviewed the studies and found them to be fatally flawed.  *See* Rebuttal Report ¶¶ 5, 11, 12 (explaining that the first study was a cell culture study, not a clinical trial; the second study was a retrospective observational study—not a clinical trial—in which patients received ivermectin together with other pharmaceutical agents and which concluded that "the limitations of this retrospective analysis make it difficult to draw conclusions about the efficacy of using [ivermectin] to treat patients with COVID-19"; and the third study was not peer-reviewed).  Dr. Ehni also notes that "Dr. Huber does not reference any studies on [the] use of ivermectin as prophylaxis against COVID -19 infection[,]" the issue here.  *Id.* ¶ 9.

Finally, Dr. Huber states that she has published "hundreds" of peer-reviewed studies, including studies that show that ivermectin is an effective COVID-19 treatment and prophylactic.  Huber Report ¶¶ 2, 10.  Publishing in a peer-reviewed publication is a "hallmark of expert witness reliability." *United States v. Young*, 916 F.3d 368, 380 (4th Cir. 2019).  Dr. Huber states that her "curriculum vitae show[s] some of [her] hundreds of published articles."  Huber Report ¶ 2.  But of the eleven

---

[6] Leon Caly, et al., *The FDA-approved drug ivermectin inhibits the replication of SARS-CoV-2 in vitro*, ANTIVIRAL RES. 178 (Jun. 2020), https://doi.org/10.1016/j.antiviral.2020.104787; Juliana C. Rajter, et al., *Use of ivermectin is associated with lower mortality in hospitalized patients with coronavirus disease 2019: The ivermectin in COVID nineteen study*, CHEST 159(1):85–92 (Jan. 2021), https://doi.org/10.1016/j.chest.2020.10.009; Hisaya Tanioka, Sayaka Tanioka, Kimitaka Kaga, *Why COVID-19 is not so spread in Africa: How does lvermectin affect it?* MEDRXIV (Mar. 26, 2021), https://doi.org/10.1101/2021.03.26.21254377.

Page 21 – OPINION AND ORDER

articles listed on her CV, only five concern COVID-19, and none have titles that mention ivermectin or COVID-19 treatment or prophylaxis.[7]  *See* Huber Report at 8. Of the five COVID-19 articles listed on her CV, purportedly peer reviewed, all were published in an online entity titled Primary Doctor Medical Journal  ("PDMJ"), an entity that Dr. Huber helped create.  Huber Dep. 81:03–81:23, 82:16–84:01.  She registered, owns and operates the PDMJ website.  *Id.* at 82:16–84:01, 89:10–90:07.

PeaceHealth contends that "[Dr. Huber] has designed a web of alternative sources and organizations to provide an appearance of legitimacy without peer review and without disclosing her conflicts of interest[,]" and that "[PDMJ] is essentially a blog, dressed up to mimic the look of a peer-reviewed journal."  Def. Reply at 9.   At deposition, Dr. Huber refused to identify any other PDMJ founders or reviewers and declined to explain how its "peer review" process works.  Huber Dep. 82:10–84:01, 86:05–18.  Dr. Huber admits she has not submitted a journal for publication in a "conventional medical journal" since 1998, *id.* at 85:01–18, aside from one article about COVID mortality and lockdowns that was rejected from "the journal of public health policy and something" during the pandemic, *id.* at 94:06–94:23.

---

[7] On her CV, Dr. Huber lists five articles that she authored that pertain to COVID-19: *Heart damage from the COVID vaccines: Is it avoidable?* PRIMARY DOCTOR MEDICAL JOURNAL (PDMJ) 3 (Jul. 14, 2021); *Data that disprove the COVID pandemic. With Boris Borovoy*, PDMJ 2 (Dec. 19, 2020); *Masks: false safety and real dangers. Parts 1, 2, 3 and 4. With Boris Borovoy, Maria Crisler and Q Makeeta*, PDMJ 1 (Jul. 6, 2020, Oct. 9, 2020, Nov. 2, 2020, Dec. 7, 2020); *Lockdowns failed to reduce deaths in the US: Total deaths declined more from previous years, in free states rather than in lockdown states in spring 2020*, PDMJ 1 (Jun. 12, 2020); *Masks are neither effective nor safe: A summary of the science*, PDMJ 1 (Jul. 6, 2020).  Huber Report at 10, ECF No. 39-2.

Page 22 – OPINION AND ORDER

Prior to deposition, Dr. Huber failed to disclose that she owns and operates PDMJ. Not only did Dr. Huber mislead the Court as to the reliability of her publications, which were not meaningfully peer reviewed, but she also failed to disclose a conflict of interest that further undermines her opinion's reliability.

        c.    *Methodology*

Plaintiff contends that "Dr. Huber makes the perfect expert witness for this case because she literally wrote the book on treatments for COVID" and "is one of the leading experts in the world on early treatments for COVID, including ivermectin." Pl. Corrected Sur Reply at 1–2, 7, ECF No. 44. But nothing in either *Daubert* or the Federal Rules of Evidence "requires a district court to admit opinion evidence that is connected to existing data only by the [say so] of the expert." *Joiner*, 522 U.S. at 146. "[T]o qualify as 'scientific knowledge,' an . . . assertion must be derived by the scientific method." *Daubert*, 509 U.S. at 590; *see also* Fed. R. Evid. 702 (To be admissible, expert testimony must be "the product of reliable principles and methods.").

Dr. Huber's opinion is not the product of reliable scientific methodology. She not only failed to base her opinion on sufficient facts and data, but she also failed to address the relevant peer-reviewed medical and scientific studies, and she took direction from Plaintiff's counsel.

First, Dr. Huber failed to examine and rebut the peer-reviewed scientific studies that constitute the medical consensus that ivermectin is not an effective COVID-19 treatment or prophylactic. *See* Rebuttal Report ¶¶ 6, 7, 8, 13 (explaining

Page 23 – OPINION AND ORDER

that no peer reviewed medical journal, reputable peer reviewed medical textbook, respected medical institution, or governmental or international agency such as NIH, CDC, FDA, and WHO "recommended the use of ivermectin for treatment of COVID-19, let alone prolonged use for prophylaxis"). A minority opinion is not necessarily unreliable, but here Dr. Huber failed to provide a sufficient factual basis for her opinion, and she failed to rebut or distinguish the medical consensus. *See Daubert*, 509 U.S. at 590 ("[A] known [hypothesis] which has been able to attract only minimal support within the [medical] community may properly be viewed with skepticism."). Second, in reaching her opinion, Dr. Huber took direction from Plaintiff's counsel who instructed her to "write about ivermectin." Huber Dep. 209:12–210:22. Dr. Huber's personal view is that Vitamin D is a better COVID-19 prophylactic than ivermectin. *See* Huber Dep. 178:04–180:14; 110:06–111:05.

In sum, Dr. Huber's opinion that PeaceHealth could have accommodated Plaintiff with ivermectin is not reliable. Dr. Huber based her opinion on insufficient facts or data—anecdotal clinical experience and studies that either do not support her opinion or were not properly peer reviewed. "Where not based on independent research, [expert] testimony must be supported by objective, verifiable evidence that it rests on scientifically valid principles, such as peer review and publication in a reputable scientific journal." *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 289 F. Supp. 2d at 1238. And Dr. Huber cherry-picked facts and data to support a pre-determined conclusion. "Cherry-picking" facts and data, as Dr. Huber has done, "undermines principles of the scientific method and is a quintessential example of

Page 24 – OPINION AND ORDER

applying methodologies (valid or otherwise) in an unreliable fashion." *In re Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin & Metformin) Prods. Liab. Litig.*, 93 F.4th 339, 347 (6th Cir. 2024); *see also Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 269 (2d Cir. 2002) (where the flaw in the expert's methodology is large enough that the expert lacks "good grounds" for the conclusion, the opinion is inadmissible).

For these reasons, the Court concludes that Dr. Huber's testimony is not admissible under *Daubert* and Rule 702 and excludes her testimony in its entirety.

B.    *Plaintiff could not work fully remotely*

Plaintiff was employed by PeaceHealth as a Quality Program Lead. Buss Decl. ¶ 6; Le Decl. ¶ 32. PeaceHealth employed one Quality Program Lead at each of its five Critical Access Hospitals. Gryte Decl. ¶¶ 5, 6, ECF No. 29. Plaintiff contends that she could perform the essential functions of her job fully remotely. But, at deposition, Plaintiff conceded that at least two of those essential functions required her to be on site: (1) as part of her safety responder duties, she was required to be on site to respond to caregiver safety reports and to potentially harmful patient events; and (2) as part of her regulatory duties, she was required to facilitate hospital access to surveyors and to accompany them around the facility. Pl. Dep. 25:13–28:08; 29:07–31:01; *see also* Gryte Decl. ¶¶ 3, 5, 6, 8 (Plaintiff's direct supervisor, Director of Quality for Critical Access Hospitals, describing the onsite essential functions of a Quality Program Lead during the relevant timeframe); Blum Decl. ¶¶ 3, 6, 7, ECF No. 32 (System Director of Quality and Infection Prevention describing same); *id.* ¶ 7,

Page 25 – OPINION AND ORDER

Exhibit 1, September 27, 2021 email between Ms. Blum and HR describing onsite responsibilities of a Quality Program Lead, ECF No. 32-1.

Plaintiff concedes that she could not fully perform the essential functions of her job remotely.  And Plaintiff does not dispute that "employers have the ultimate authority to determine . . . the essential functions of a job position, and [whether such functions] require[] in-person work."  *Kather v. Asante Health Sys.*, No. 1:22-CV-01842-MC, 2025 WL 1788267, at *8 (D. Or. June 25, 2025) (citing *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 991 (9th Cir. 2007)); *see also* 42 U.S.C. § 12111(8) (ADA requires that "consideration shall be given to the employer's judgment as to what functions of a job are essential").  Accordingly, the Court concludes that there is no issue of material fact as to whether Plaintiff could fully perform the essential functions of her job remotely.  She could not.

C.    *Undue Hardship*

Plaintiff contends that PeaceHealth could have allowed her to work either with ivermectin treatment or remotely without undue hardship.   Pl. Resp. 8, 12.

The ADA undue hardship standard requires that an employer show that an accommodation would require "significant difficulty or expense."  42 U.S.C. § 12111 (10)(A).  To determine "significant difficulty or expense," courts rely on EEOC Enforcement Guidance.[8]  That Guidance directs courts to consider the nature and

---

[8] EEOC ENFORCEMENT GUIDANCE: REASONABLE ACCOMMODATION & UNDUE HARDSHIP UNDER THE AMERICANS WITH DISABILITIES ACT No. 915.002 (Oct. 17, 2002), https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada#undue (last visited Apr. 28, 2026); ORS 659A.121(2)(a–d).

cost of the accommodation, the employer's financial resources, the number of employees and facilities, the effect on the facility's expenses and resources, the employer's type of operation including the structure and functions of the workforce. EEOC Enforcement Guidance; ORS 659A.121(2)(a–d). To assess undue hardship, courts thus consider non-economic factors ("difficulty") and economic factors ("expense").

Though undue hardship under the ADA is not identical to that of Title VII, the two standards are similar. The ADA contemplates "significant difficulty or expense" in light of the "operations" and "composition, structure and functions of the workforce[,]" and Title VII contemplates "substantial cost" in the context of the employer's business. *See Groff v. DeJoy*, 600 U.S. 447, 470–71 (2023) (directing courts to resolve the undue hardship issue "in [a] common-sense manner" and to "take[] into account all relevant factors . . . including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of [the] employer").

In the COVID-19 context, the Ninth Circuit, citing *Groff*, recently held that relevant undue hardship factors include: (1) "health and safety costs[,]" which the court analyzed as health and safety *risks* to the plaintiffs' coworkers and to the public they served; (2) the employer's "operational burdens;" (3) and the employer's "financial burdens." *Petersen v. Snohomish Reg'l Fire & Rescue*, 150 F.4th 1211, 1218, 1220–21 (9th Cir. 2025) (emphasis added) (affirming summary judgment for employer fire department on its undue hardship defense to unvaccinated firefighters'

Page 27 – OPINION AND ORDER

Title VII failure-to-accommodate claims); *see also Williams v. Legacy Health*, ____

F.4th ____, No. 24-5977, 2026 WL 1239760, at *3 (9th Cir. May 6, 2026) (affirming

summary judgment for employer healthcare facility on its undue hardship defense to

healthcare employees' Title VII failure-to-accommodate claims and explaining that

"substantial additional costs" under *Groff* "need not be exclusively monetary" and can

include "health and safety costs" and "operational burdens" as well as traditional

"financial burdens").

*Petersen* and *Williams* align with general EEOC COVID-19 guidance,[9] which

provides that courts consider, among other undue hardship factors, "the burden on

the conduct of the employer's business—including, in this instance, the risk of the

spread of COVID-19 to other employees or to the public" and "the number of

employees who are seeking a similar accommodation, *i.e.*, the cumulative cost or

burden on the employer."  EEOC COVID-19 Guidance, § L.3. As to ADA-specific

guidance, courts "may rely on CDC recommendations" and may consider, among

other factors, "the extent of employee contact with nonemployees . . . who may be

ineligible for the vaccine or whose vaccination status may be unknown[.]"  EEOC

COVID-19 Guidance, § K.6.

To determine undue hardship, courts in this district also consider (1) the

information available at the time the employer made its undue hardship decision; (2)

---

[9] EEOC, WHAT YOU SHOULD KNOW ABOUT COVID-19 AND THE ADA, THE REHABILITATION ACT, AND OTHER EEO LAWS, § L.3 (updated May 15, 2023) https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws (last visited Apr. 28, 2026).

Page 28 – OPINION AND ORDER

the economic and non-economic costs of the accommodation; and (3) the aggregate effects of accommodations requested by multiple, similarly situated employees. *Lavelle-Hayden v. Legacy Health*, 744 F. Supp. 3d 1135, 1151–52 (D. Or. 2024).

### 1. *The Information Available at the Time*

"[I]t is appropriate to confine the [undue hardship] analysis to the information available to the employer when it made its undue hardship decision." *Lavelle-Hayden*, 744 F. Supp. 3d at 1152. "To judge an employer's undue hardship decision based on knowledge and information developed after the fact would hold that employer to an impossible standard." *Id.*; *see also Williams*, 2026 WL 1239760, at *4 (rejecting "'hindsight' reasoning" and asking instead "whether the employer 'acted reasonably' in relying 'on the objective, scientific information available to it' when denying . . . exemption from vaccination requirement").

When PeaceHealth's Team formulated its vaccination and exception policy, the information available at the time included: (1) then current (and unrebutted) scientific and medical evidence that COVID-19 vaccination was safe, reduced viral transmission, and "offered high levels of protection against severe illness and death from COVID-19," Koekkoek Decl. ¶¶ 32–34, 36, 38, 39, 40; (2) the OHA Rule that required vaccination for health care employees and removed the testing option at the beginning of the Delta surge, Def. Mot. at 27; Koekkoek Decl. ¶¶ 30, 51; (3) PeaceHealth's internal epidemiologic data that showed that patients were 11.6 times more likely to be infected with COVID-19 by unvaccinated caregivers than by vaccinated caregivers, *id.* at 28; Koekkoek Decl. ¶ 21, and that two patient deaths

Page 29 – OPINION AND ORDER

had been traced to an unvaccinated caregiver, Koekkoek Decl. ¶ 44; and (4) PeaceHealth's census data that revealed a predominantly medically vulnerable and unvaccinated patient population, Def. Mot. at 29; Koekkoek Decl. ¶¶ 7, 36, 43, 48; Kroll Decl. ¶¶ 20, 21.

The Team also considered alternative mitigation methods and determined that vaccination was superior to those methods. "PPE (including N95 masks), testing, social distancing, restrictions on visitation, and additional hand hygiene protocols— were already the 'baseline' requirements, [but] do not provide continuous protection 24 hours per day, and are susceptible to human error[,]" *id.* ¶ 44; PPE must be worn "constantly and appropriately" and is often not, for example, in breakrooms when people are eating and drinking, *id.*; testing is problematic because "by the time an individual tests positive, they have often been contagious for 48 hours prior to the test[,]" *id.* ¶ 45; physical distancing in a health care setting is not practicable, *id.*

PeaceHealth considered potential accommodation for (1) employees who provided direct patient care; (2) employees, such as Plaintiff, who did not provide direct patient care but who interacted with staff who did; and (3) employees who could work remotely without contact with other staff. Def. Mot. 30–31 (citing Koekkoek Decl. ¶ 43). Based on the information available at the time, PeaceHealth determined that onsite staff, regardless of whether the employee provided direct patient care or not, posed "unjustifiable" health and safety risks to other staff and directly or indirectly to its vulnerable patient population. *Id.*

Page 30 – OPINION AND ORDER

As to ivermectin, Dr. Ehni stated that the medical and scientific consensus at the time was that ivermectin was not an effective COVID-19 treatment or prophylactic. Rebuttal Report ¶ 13. Dr. Ehni opined that "PeaceHealth would not be expected to use anecdotal evidence, nonpeer reviewed, pre-print journals articles, online opinion pieces, or website data with poor methodology[,]"—Plaintiff's purported support for ivermectin—"to make COVID-19 policy decisions." *Id.* Further, "[u]se of such sources would lead to inappropriate policies and treatments with higher risk of spread of COVID-19 infection in healthcare employees and vulnerable patients." *Id.*

### 2. *The Cost of Accommodation in the Aggregate*

To determine whether the cost of accommodating an employee constitutes an undue hardship in the COVID-19 context, courts consider (1) the health and safety risks to the public and to other employees in the workforce; (2) the operational burden created by absenteeism, scheduling disruption, and the inability of the employer to respond to emergencies; and (3) the financial costs of the accommodation. *Petersen*, 150 F.4th at 1218–21; *see also Groff*, 600 U.S. at 475 (Sotomayor, J., concurring) ("Because the 'conduct of [a] business' plainly includes the management and performance of the business's employees, undue hardship on the conduct of a business may include undue hardship on the business's employees. . . . Indeed, for many businesses, labor is more important to the conduct of the business than any other factor."). Further, "costs need not be realized prior to raising an undue-hardship defense." *Williams*, 2026 WL 1239760, at *3. "A 'risk of undue hardship' will suffice—

provided it is 'realistic' and 'not merely conceivable or hypothetical.'" *Id.* (quoting *Petersen*, 150 F.4th at 1222). *See, e.g.*, *Bordeaux v. Lions Gate Ent., Inc.*, 703 F. Supp. 3d 1117, 1134, 1136 (C.D. Cal. 2023), *aff'd*, No. 23-4340, 2025 WL 655065 (9th Cir. Feb. 28, 2025) ("Numerous courts have found the possibility of an unvaccinated individual getting others sick to be a non-speculative risk that a court may consider when performing an undue hardship analysis.") (collecting cases); *Melino v. Bos. Med. Ctr.*, 127 F.4th 391, 397 (1st Cir. 2025) ("permitting [a hospital employee] to work unvaccinated would pose an undue hardship 'by increasing the risk of COVID-19 transmission amongst staff and patients'"); *Hall v. Sheppard Pratt Health Sys., Inc.*, 155 F.4th 747, 754–55 (4th Cir. 2025) ("Allowing over two hundred religious-exemption claimants to remain unvaccinated would have unacceptably increased the risk of COVID-19 transmissions and outbreaks[,]" but "[i]t is likely that granting even [a] single religious exemption would have constituted an undue hardship for the hospital system."); *Petersen*, 150 F.4th at 1220 (explaining that the operational burden from "outbreaks among firefighting teams [from unvaccinated co-workers]" included "potentially severe limits on EMS and firefighting responses in the community.").

When multiple, similarly situated employees request accommodation, it is appropriate for a court to "consider the aggregate or cumulative effects of an accommodation[.]" *Lavelle-Hayden*, 744 F. Supp. 3d at 1152; *see also Petersen*, 150 F.4th at 1220 ("The cost of accommodating nearly twenty-five percent of its firefighters is substantial. . . . And given the circumstances, there can be no doubt

Page 32 – OPINION AND ORDER

that granting that many exemptions would have hamstrung [the Fire and Rescue's] operations."). *Kather*, 2025 WL 1788267, at *7 ("In addition to the administrative strain, the sheer number of exception requests compounded the undue hardship inherent in allowing unvaccinated individuals to work in person because the cumulative risk [to the health and safety of patients and the workforce] would have been much greater than the individual impact of any single unvaccinated employee.").

PeaceHealth attests that by December 27, 2021, it had received medical and/or religious exception requests from 968 employees system-wide, of which it granted 810. Le. Decl. ¶ 21. In Oregon, PeaceHealth received 243 medical and/or religious exception requests, of which it granted 206. *Id.* PeaceHealth attests that it placed all unvaccinated employees who, like Plaintiff, could not perform the essential functions of their jobs 100% remotely on administrative leave. *Id.* ¶ 24.

Plaintiff first contends that PeaceHealth could have accommodated her by offering ivermectin as COVID-19 prophylaxis. But given the unrebutted scientific and medical evidence that ivermectin was not an effective COVID-19 prophylactic, Plaintiff's presence in the workplace—even with properly administered and monitored ivermectin treatment—would have increased her risk of acquiring the virus and transmitting it to other co-workers and to PeaceHealth's vulnerable patient population. The increased risk of sickness and death to PeaceHealth's patient population alone constitutes significant difficulty or expense.

In addition, the resulting prolonged patient stays would have further impaired PeaceHealth's ability to deliver healthcare in response to the pandemic. *See* Kroll

Page 33 – OPINION AND ORDER

Decl. ¶ 20 ("Hospital-acquired COVID-19 could prolong a patient's stay in one of [PeaceHealth's] facilities by days or weeks, further straining limited hospital resources."). Increased outbreaks among co-workers would have compounded absenteeism and scheduling disruptions and further "threatened PeaceHealth's ability to continue providing essential, life-saving treatment for its patients." Koekkoek Decl. ¶ 49. Such disruption would add to the "incredible strain on an already exhausted staff to cover shifts and hire and train contract healthcare workers." Le Decl. ¶ 22. The increased operational and administrative burdens from such accommodation directly translate into substantially increased operating costs. For all of these reasons, the Court concludes that accommodating Plaintiff—and other unvaccinated coworkers—with ivermectin would have resulted in significant difficulty or expense under the ADA.

Next, Plaintiff contends that PeaceHealth could have allowed her to work from home even though she could not perform the essential functions of her job 100% remotely. Pl. Resp. at 11–12.

To accommodate Plaintiff, PeaceHealth would have had to restructure her position and hire another employee to perform her onsite work duties. Under the ADA, a reasonable accommodation may include "job restructuring, part-time or modified work schedules, [or] reassignment to a vacant position[.]" 42 U.S.C. § 12111(9)(B). But "an employer is not required to restructure an employee's duties or pass them off to another worker if doing so would be an undue hardship." *Kather*, 2025 WL 1788267, at \*8; *see also Lake v. HealthAlliance Hosp. Broadway Campus*,

Page 34 – OPINION AND ORDER

738 F. Supp. 3d 208, 220–21 (N.D.N.Y. 2024) (holding that operational impacts from restructuring unvaccinated healthcare worker's position to avoid contact with others would have created an undue hardship). Even assuming that PeaceHealth *could have* restructured Plaintiff's position, to accommodate Plaintiff and hundreds of other similarly situated unvaccinated employees would have wreaked operational and administrative havoc and significantly increased PeaceHealth's financial costs.

Plaintiff provides no evidence that PeaceHealth could have accommodated Plaintiff and hundreds of other similarly situated unvaccinated employees with either ivermectin treatment or restructured remote positions without significant difficulty or expense. On this record, no reasonable juror could conclude that PeaceHealth could have reasonably accommodated Plaintiff and the hundreds of other similarly situated unvaccinated employees without undue hardship. Accordingly, PeaceHealth is entitled to summary judgment on its undue hardship defense to Plaintiff's ADA and Oregon disability accommodation claims.

D.    *Direct Threat*

A direct threat under the ADA is "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." *Echazabal v. Chevron USA, Inc.*, 336 F.3d 1023, 1028 (9th Cir. 2003) (citing 29 C.F.R. § 1630.2(r)). A direct threat determination "shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." *Id.* In weighing the risks and their magnitude, "the views of public health authorities, such as the U.S. Public

Health Service, CDC, and the [NIH], are of special weight and authority." *Bragdon v. Abbott*, 524 U.S. 624, 650 (1998). Here, that also includes OHA. In reviewing those authorities, courts consider: (1) the "duration of the risk;" (2) the "nature and severity of the potential harm;" (3) the "likelihood that the potential harm will occur;" and (4) the "imminence of the potential harm." *Echazabal,* 336 F.3d at 1028.

Plaintiff does not rebut then current scientific and medical evidence, including evidence from the CDC, NIH, OHA, that, during the relevant timeframe, (1) the duration of the COVID-19 risk was unknown; (2) the nature and severity of potential harm was grave given the unprecedented number of deaths from the Delta variant; (3) the likelihood that the harm would occur was high given the increased risk of transmission from an unvaccinated employee—even one treated with ivermectin—to co-workers, including to co-workers who provided direct patient care; and (4) the potential harm was imminent, as evinced by the "cooling bays" that PeaceHealth had to create to hold dead bodies.

PeaceHealth determined, based on the "most current medical knowledge" and "best available objective evidence," that unvaccinated employees, regardless of accommodation, posed a significant risk of substantial harm to the health and safety of others in the workplace. Plaintiff offers no evidence that ivermectin treatment would have eliminated or reduced that risk. On this record, no reasonable juror could conclude that PeaceHealth could have reasonably accommodated Plaintiff and the hundreds of other similarly situated unvaccinated employees without causing a significant risk of substantial harm to the health and safety of others in the

Page 36 – OPINION AND ORDER

workplace. Accordingly, PeaceHealth is also entitled to summary judgment on its direct threat defense to Plaintiff's ADA and Oregon disability accommodation claims.

## CONCLUSION

For the reasons explained above, Defendant's Motion for Summary Judgment, ECF No. 27, is GRANTED. Judgment shall be entered accordingly.

It is so ORDERED and DATED this ___7th___ day of May 2026.


       /s/Ann Aiken                               
       ANN AIKEN
       United States District Judge